## Case No. 9,792.

### MOREHEAD v. UNITED STATES.

[Hoff. Op. 404.]

District Court, N. D. California. May 26, 1859.

MEXICAN LAND GRANT—LOST GRANT—EXPEDIENTE
REGULAR—SUSPICIOUS FACTS.

[1. The rule is that, before the contents of a paper alleged to be lost can be proven, satisfactory evidence must be produced to prove its execution and the loss. But in cases where three things are so intimately blended together, and there can be no question as to the contents, and no possible motive for withholding it, the contention being in reference to the execution, then the court will not be so strict as to evidence as to loss.]

[2. Where the archives show the expediente to be regular and its signatures genuine, and a grant to have issued thereon, and there is no evidence to show any fraud or tampering with the archives, the grant will be allowed, although there is evidence to throw doubt upon the fact that the claimant was at the place where the grant purports to have been signed and delivered to him.]

HOFFMAN, District Judge. The land claimed in this case consists of ten leagues, situated on the Sacramento river, at the place now called "Knight's Landing," in the county of Yolo. The claim was rejected by the board, for non-fulfillment of the con-

ditions of occupation and cultivation. It appears, however, from the evidence, that Knight, the grantor, settled on the land in 1842 or 1843, and continued to occupy it until 1849, when he died, on the Stanislaus river, a distance of about one hundred miles. As early as June, 1843, Knight petitioned Governor Micheltorena for the land alleged to have been subsequently granted to him by Pio Pico, but in pursuance of Jimeno's recommendation, the proceedings on this, as on numerous similar applications, were suspended, until the governor should make his projected visit to the Sacramento and San Joaquin valleys. On the 22d December, 1844, Micheltorena issued the document known as his "general title," whereby he granted to all the citizens who had solicited with reports in their favor from General Sutter, the lands described in their respective petitions and maps. As Knight had not only not obtained the favorable report of Sutter, but as the report of the alcalde of Sonoma to whom the application had been referred by Sutter, had declared the land to be occupied by Don Tomas Hardy, he was, of course, not embraced within the class of grantees mentioned in the general title.

The grant on which the claimant, [James G. Morehead,] who is the administrator of Knight, relies, is alleged to have been made by Pio Pico on the 4th of May, 1846. The original grant is not produced, and evidence has been offered to prove its execution, loss and contents. It is objected that the loss of the original is not sufficiently proved to justify the admission of secondary evidence as to its contents. "Where evidence of the contents of a writing alleged to be lost is proposed to be given, the natural order of making the proof is to show—First, that the original existed; secondly, that it has been lost; and, thirdly, its contents. It has been said, however, that unless proof is adduced satisfactory to the court, of the loss or destruction, evidence as to execution and contents can not be submitted to the jury." Jackson v. Frier, 16 Johns. 193; [De Haven v. Henderson], 1 Dall. [1 U. S.] 424; 3 Har. & J. 219. "But these facts are frequently so intimately blended together, and have such a mutual relation to, and dependence upon each other, that it is difficult and often impossible to observe strictly the logical order of the proofs. The amount of proof of loss or destruction which will be exacted, depends in a great degree upon the nature of the case. If any suspicion hangs over the instrument, or that it is designedly withheld, a rigid inquiry should be made as to the reasons of its nonproduction. But where there is no such suspicion, all that ought to be required is reasonable diligence to obtain the original." Minor v. Tillotson, 7 Pet. [32 U. S.] 99, 101. "Where there is no ground for suspicion that the paper is intentionally withheld, nor any discernible motive for deception, courts are extremely liberal in regard to secondary evidence." 6 Vt. 399. "Where the paper is of that description that no doubt can arise as to proof of its contents, there can be no danger in admitting secondary evidence." [Renner v. Bank of Columbia], 9 Wheat. [22 U. S.] 581–587; U. S. v. Doebler [Case No. 14,977]. "Ordinary diligence is usually enough and it will ordinarily suffice that the paper has been sought for, where it might be supposed likely to be found or was usually kept and that the search was fruitless." 3 McCord, 322.

The above observations taken from the decisions of various courts apply with much force to the case at bar. The original grant is alleged to have been lost;—but the claimant produces from the archives the expediente containing the original petition with the marginal order of the governor, the decree of concession which directs the title to be made out, and a copy of that title as delivered to the party. If these papers are genuine, the existence and contents of the lost grant are sufficiently proved, and no motive can be suggested for its suppression. The copy produced shows it to have been in the usual form and with the usual conditions, and the description of the land is, as usual, taken from the petition.

The real controversy of the case is not as to the contents of the lost grant, but as to whether a grant was ever issued. As the court, before it can be satisfied that a paper has been lost or destroyed, must first be satisfied that it once existed, the proofs on the latter branch of the inquiry must first be considered. If, then, the evidence in this case is sufficient to establish that a grant was made on the petition produced from the archives, I am clearly of opinion that the proofs of loss are sufficient to meet the technical requirements as to the admission of secondary evidence. If, on the other hand, the evidence does not establish that a grant was made, then the claim must be rejected because the claimant has failed to make out his case; but not for the reason that he has not furnished sufficient preliminary proof of the loss or destruction of his title to allow secondary evidence of the contents to be given.

It is proper to add that though the objection as to the insufficiency of the proof of loss was taken, the arguments of the counsel who represented the United States were chiefly directed to an investigation of the evidence relating to the existence at any time before the conquest of any grant of the land. To this inquiry which is thus, in any point of view, preliminary, we will now address ourselves. The only witness who testifies that he knows the grant was made, is Jose Matias Moreno. He states that when he was secretary to the government in 1846, Knight petitioned for a tract of land on the Sacramento. The governor made a decree for a title to the land peti-

tioned for, and the title was accordingly issued. He further swears that he believes the copy of the grant found in the expediente is a copy of the title issued to Knight. If this witness were entirely worthy of credit this testimony confirmed as it is by the expediente found in the archives would be sufficient to establish the facts to which he swears. This court has, however, on more than one occasion been compelled to reject as simulated and ante-dated grants, the genuineness of which was positively sworn to by Moreno. A careful investigation of all the testimony in the case is therefore necessary, notwithstanding his positive statements. J. M. Harbin swears that Knight was with him in the spring of 1846 at Los Angeles about three weeks. That the witness was there about a month and that he found Knight there, but he left the place before the witness; that Pio Pico, the governor, told him he had given Knight his papers, and that Knight also told him he had them, when he was getting on his horse to leave. Knight also told him that he was going to leave his papers with John Wilson of Santa Barbara, that he might obtain their confirmation by the departmental assembly. N. A. Den swears that he saw Knight in the spring of 1846, either in March, April or May, on his way to Los Angeles, and also on his return. On his return he stated that he had got his papers for his rancho, and a short time afterwards, in looking over the archives at Los Angeles, the witness saw evidence that he had done so. J. C. Davis swears that about the 5th of June he was in Col. Fremont's camp at the "Buttes," when Knight came in and informed them that all the Americans in California would be ordered out of the country by the government. Some one then remarked that he would, in that event, lose his rancho, to which he replied that he had just returned from the lower country, and had procured his title papers, at the same time producing some papers which he said were his title, but which the witness did not read.

Evidence has been offered on the part of the United States to show that Knight could not have been at Los Angeles in the beginning of May, as sworn to by Harbin, and that the relations which then existed between the Mexican authorities and the American settlers rendered it in the highest degree improbable that the government could have been induced to make him a grant. Knight's conduct and declarations are also relied on as showing that the only title papers he possessed were the Micheltorena papers of 1884. Major John Bidwell, after detailing the circumstances connected with Knight's first application to Governor Micheltorena, and his failure to obtain a grant from that officer, states that he returned those papers to Knight in 1844, and that he did not see them again until

the spring or summer of 1847, when Knight brought them to him and asked him if anything more could be done with them, and if his title was a good one, as the papers then stood; that some persons were under the impression that the American governors had the same authority to grant lands as the Mexican governors had possessed, and that Knight made the inquiry of him whether anything could be done with the papers, because he entertained such views or understood that they were entertained. The witness states that at this time Knight exhibited no other papers than those which he (witness) had returned, unless, perhaps, a copy of the general title of Micheltorena; but he is positive that there was no formal title shown him, nor was any reference made by Knight to any other title papers for the land than those he exhibited to the witness. Major Bidwell also states that in the spring of 1846 a journey from the Sacramento valley to Los Angeles and back would have required some six weeks to accomplish, and that it was considered unsafe unless in companies of eight or ten persons. Riding and pack horses were necessary, with provisions and led horses; that the water courses were high, as they usually are in the spring, and that he (witness) was waiting in the spring of 1846—March, April and part of May—to make the trip, on account of the height of the water courses necessarily crossed in traveling in that direction. He further states that he thinks Knight was in the Sacramento valley, at his place, in the spring of 1846; that if he had been absent or far away he thinks he should have known it, because there were but few Americans in the country. "We knew each other, and if one had been absent I think I should have known it." That persons leaving the valley uniformly applied to General Sutter for passports. That Knight did not make such an application; that he (witness) was with General Sutter, kept his books, and did most of his writing. General Sutter testifies that he knows that in 1845 or 1846, probably in the fall of 1845, Knight went to Los Angeles to get a title for his rancho from Pio Pico; that he is doubtful whether it was in the spring of 1846, for the water courses, as is usual in the spring, were very much swollen: In a subsequent part of his deposition he states that in the winter of 1846, just before the Bear Flag was raised, he and Knight had a dispute about the quantity of land solicited by Knight; that Knight said he would not take a grant for less than ten leagues, and became so excited about it that he drew a pistol upon him (witness), and that subsequently they had no intercourse. He adds that Knight could not have been in Los Angeles in May, 1846, because he was then with Colonel Fremont. The testimony of this witness rather tends to establish the facts alleged by the claimants than to dis-

prove them. He states positively, it will be observed, that Knight went to Los Angeles to get a grant from Pio Pico in 1845 or 1846; but he thinks it was in the fall of 1845. The conversation with Knight, which he says occurred in the succeeding winter, shows that at that time Knight did not have his grant. If, then, Sutter is right in saying that Knight went to Los Angeles at all to obtain a title from Pico, it would seem most probable that he went in 1846, and not in the fall of 1845.

J. P. Leese testifies that the marginal note on the petition to Micheltorena, dated January 26th, 1844, was written by him at the time it bears date, except the words, "una parte de ello," which were added subsequently at the solicitation of Knight and in the presence of Hardy; that these words were added at the time he made the certificate which is appended to the papers, and which was made October 8th, 1849; that Knight represented that he had been unable to get his title from the governor, because his (witness) report showed that the land had been granted to Hardy, and that he (the witness) thereupon added the words above mentioned to his report, and appended his certificate to the papers. He further states that Knight on this occasion brought all his papers to be examined by the witness, and that the only papers he recollects seeing were the Micheltorena papers. On his cross-examination, Leese modifies the foregoing statement in an important particular. He testifies that Knight informed him he had not been able to obtain a grant in the fall of 1845, and not in 1847, as he had previously sworn; and that Knight never made to the witness any declaration to the same effect subsequently. He also states that the words "una parte de ello," were added by him when he was going out of office in 1845; and, finally, that he cannot swear that those words were added by him at all.

From the whole of Leese's testimony, it may, I think, be fairly concluded that the words added to his report were, in all probability, placed there in the fall of 1847; but that the declaration of Knight that he had not obtained a title was made in 1845, before the date of the title now claimed to have been issued. D. M. Berrey testifies that he has heard Knight speak on several occasions of his title papers; that he abused Bidwell for not getting a grant for him from the governor; that he thought his claim would be doubtful in consequence; that he had the alcalde's papers, which were a shadow of title, and that Fremont or Bidwell had told him a shadow of title would be good; that in 1847 he refused to sell the witness a part of his rancho, fearing to weaken his title by dividing the land, and saying that when he got his grant or title to the rancho he would let him (witness) have as much as he wanted. William Gordon testifies that he saw Knight at his house, about eleven miles from Knight's rancho, in the early part of June, 1846; that he was then with the war party which shortly afterwards took Sonoma. He adds that Knight told him, after this campaign, that he had his papers "all regulated about right in his land affairs," but did not mention that he had been to Los Angeles to get them fixed. It will be observed that the date at which the witness saw Knight at his house (in the early part of June), is quite consistent with the hypothesis that Knight left Los Angeles in the beginning of May. As also with the statement of Davis, that Knight came into Fremont's camp at the "Buttes," about the 5th June. This witness also states that he does not remember having seen Knight at any time in the early part of 1846, before the month of June, although he may have done so. Major Gillespie, who was an officer of the marine corps "under special and confidential order from the president of the United States," testifies that he met Knight in the Sacramento valley early in the month of June, 1846; that he (Knight) joined the Bear Flag insurrection between the 26th May and the 1st June; that in the latter part of April and the month of May the country between Sutter's Fort and Los Angeles was overflowed, so much so that his courier, Sam Neal, was obliged to turn back, cross the Sacramento river at the fort, and go down by way of Sonoma; that it would have required to make the journey, under ordinary circumstances, about six weeks, but on express fifteen or twenty days. In reply to the twenty-first interrogatory, Major Gillespie states that he does not know the exact distance from Sutter's Fort to Los Angeles; that at that time it was computed by day's travel more than by miles. "By ordinary traveling, it took fifteen days; by express, from six to seven days." There is probably some error in reducing the deposition of the witness to writing, but as the distance between the two places is about seven hundred miles, it is probable that the last answer as to the time usually required to make the journey is the correct one. Gillespie further testifies that the rising of the American settlers in the Sacramento valley took place in the latter part of May, 1846; that its immediate cause was a proclamation of Castro requiring all who had not been a year in the country, and had not been naturalized, to leave California immediately, and that the settlers had heard that a military force had orders to march against them; that the hostile feeling had prevailed from the time of Fremont's attempt to pass through the country, in March, 1846, and that from that period the communications of American settlers with the lower parts of the country were precarious and doubtful. The witness states, however, that he made during the spring a journey from Monterey to the north of Klamath Lake and back to Yerba Buena (San Francisco), though he was "in constant fear of being picked up by the authorities."

With respect to this testimony, the same observation may be made as to the deposition previously noticed, viz: that the fact that Knight was with the insurgents about the end of May or 1st of June is entirely consistent with his having been in Los Angeles about the 4th of May preceding. He is stated by Major Gillespie, to have been "a famous horseman," and even of he enlisted on the 26th of May, he would have had more than twenty days to make a journey which Gillespie says could be performed in six or seven days. The United States have introduced, however, more positive testimony to show that Knight could not have gone to Los Angeles as alleged: William Bartee swears that during the months of April, May, and June, 1846, Knight was at his rancho; that he and the witness frequently hunted together, and that during those months not more than eight or ten days could have passed without his seeing Knight. The witness states on cross-examination, that he kept no memorandum of dates, but the men with him did so; and he recollects the dates well. But that Knight was not at his rancho during the month of June is clear from all the testimony in the case. All the witnesses, both those for the United States and those for the claimants, concur in stating Knight to have been with Fremont at the end of May or beginning of June, and that he was on the expedition to Sonoma, in the early part of the latter month. Colonel Fremont himself states that Knight was employed by him as a spy in May, and that his occupation led him to the neighborhood of the Bay. Bartee is thus clearly in error in stating that Knight was on his rancho during the month of June. John Grigsby testifies that he saw Knight at his house, on the Sacramento river, on or near the 1st day of May, 1846; that he was in pursuit of a mule which had been stolen from him "by a gentleman named Dr. Carter;" that the train in which Carter was, was to start, as he understood, on the 1st of May, and he therefore hurried on to recover his mule before they started; that Knight lent him a horse when he reached his rancho, but on reaching Feather river he learned that the train would not start until the 15th, and he employed Mr. Hardy to cross the Feather river and get the mule, as soon as the waters permitted; he then returned to Knight's rancho; that he was at home, and Hardy brought him the mule in about ten days. Samuel W. Chase testifies that he saw Knight on his rancho on the 18th or 20th of April, 1846, and that John Gordon was with him at the time. John Gordon's testimony is by no means explicit. He states that he, in company with Chase, saw Knight at his rancho, but he cannot remember the day or the month; he thinks it was in the spring of 1846, some four or five months before Fremont's party started for Sonoma; that from that time

until the party started for Sonoma he saw him at intervals, sometimes, of three or four days, a week, or a month. If this witness is correct in stating that the time at which Chase and himself saw Knight at his rancho was four or five months before the expedition to Sonoma, then it must have been in January or February, 1846. Knight would thus have had ample time to make his journey to Los Angeles, and to reach Fremont's camp at the end of May or beginning of June. Nicholas Algier testifies that 1846 he lived about eight miles distant from Knight; that during that year he saw him nearly every week two or three times a week; that he saw him in March two or three times at Sutter's Fort, and at his own house, about the 10th or 15th of May; that he remembers this from the circumstance that he was ploughing to plant corn.

The foregoing testimony is chiefly relied upon by the United States, as showing that Knight could not have been at Los Angeles, as contended for by the claimants. It cannot, however, be considered as establishing the fact in a very satisfactory manner. Bartee, as we have seen, states that during not only April and May, but June, 1846, Knight was at home at his rancho; and yet it is clear that at the end of May he was at the Buttes with Fremont, and the latter testifies that he employed Knight as a spy during the month of May, and that his occupation led him to the neighborhood of the bay. S. W. Chase is not only contradicted by Gordon, by whom he says he was accompanied on a visit to Knight's rancho, about the 18th or 20th April, 1846; but in his affidavit, filed some months before his deposition was taken, he says that he saw Knight on his rancho on or about the last day of April of 1846; that he was mistaken as to one or the other of these statements is evident. It is not unreasonable to suppose that he may be mistaken in both, and that he has no distinct and reliable recollection of the date at which he saw Knight at his residence. Algier's statement, that he saw Knight at his rancho on the 10th or 15th May, 1846, is not inconsistent (if we adopt the latter date) with the hypothesis that Knight left Los Angeles about the 5th, and the witness states no fact which, after so large an interval of time, would justify us in concluding with any degree of certainty that the true date may not have been a few days later. Knight's presence at his rancho towards the end of May is entirely consistent with the theory of the case as presented by the claimants. Major Bidwell's testimony is much relied on by the United States, not only on account of the character of the witness, but because the reason he assigns for thinking Knight was in the valley during the spring of 1846 is such as, when the state of affairs in the country at the time is considered, to render it impossible that if he had been absent his

absence should not have been noticed. "There were but few Americans in the country. We knew each other, and if one had been absent I think I should have known it." It is to be remarked, however, that Major Bidwell does not swear that he knows Knight was in the valley. He merely testifies in effect, that he does not remember that he was absent, and that if he had been he thinks he should have noticed it. But Major Bidwell's deposition shows that on other points his memory is by no means reliable. He states that Knight, in 1844, petitioned the alcalde of the Sonoma district for land; that the petition was acceded to by the alcalde, and was then referred to General Sutter, from whom a favorable report was obtained. A second petition to the governor was then made out, and both petitions were presented to the governor, and by him referred to the secretary of state. An examination of the Micheltorena papers shows this account of the proceeding to be entirely erroneous. The petition was addressed to the governor, and by him referred to the prefect. The prefect referred it to General Sutter, who referred it to the alcalde of Sonoma, and the alcalde of Sonoma reported unfavorably to the petitioner. There was thus no petition to the alcalde, no favorable report by him, no reference by him to Sutter, and no favorable report by the latter. When we find Mr. Bidwell's memory so treacherous upon points like these upon which he testifies with apparent confidence, it is surely unsafe to rely upon it on others where the probabilities of error would seem to be greater. General Sutter, as we have seen, to a certain extent corroborates the statement of the claimant's witnesses, for he swears that he knows that Knight went down in 1845 or 1846 to get a title from Pio Pico. He thinks, however, that it must have been in the fall of 1845, because in the spring of 1846 the water courses were much swollen. It is not pretended that Knight obtained a title in 1845, and the conversation with Knight, related by Sutter, which he says occurred in the winter of 1846, just before the Bear Flag was raised, shows that at that time Knight had no title. If he had at that time been to Los Angeles and failed to obtain it, it is not probable that he should have omitted to mention it and have left General Sutter ignorant, as he swears he is, whether he obtained it or not. It seems, therefore, most probable either that Sutter is mistaken in his positive statement that "he knows Knight went down to get a grant from Pico," or else, if that statement be true, Knight must have gone in the spring of 1846 after his conversation and quarrel with Sutter.

It is urged by the counsel of the United States that in this case the negative testimony of Bidwell that he did not know of Knight's absence, has all the force of positive statement; that the American settlers in the Sacramento valley were a small band, menaced with extermination or expulsion from the country, and driven to rely upon each other for protection; that at such a time the absence of a bold, active man like Knight could not have escaped observation, and that, therefore, Major Bidwell's statement that he did not know of his absence, is equivalent to a positive statement that he was not absent. There is undoubtedly force in the argument. It is to be recollected, however, that the actual rising of the settlers did not take place until the latter part of May, which was also the date of the decree or bando of General Castro, ordering all Americans who had not become naturalized, and not been a year in the country, to leave California. The settlers also heard about the same time that Castro and Vallejo were collecting horses to send to San Jose to mount their men. It is true that Major Gillespie states that the causes which produced the rising had been in operation from the time of Fremont's attempt to pass through the country in March. But it is evident that during the months of March and April no such measure could have been contemplated by the American settlers, for Fremont after remaining more than a month in the valley directed his march towards Oregon, which he assuredly would not have done had he supposed that he was abandoning his countrymen to the violence of the Californians. Even so late as the 22d of April, 1846, he left Lassen's rancho, the furtherest north of the American settlements, still continuing his march towards Oregon. It was only on the 9th of May, after being overtaken by Gillespie, that he counter marched, and returning reached the American settlements on the 24th. It was then that the settlers joined him and hostile operations took place. That Knight was with him then is clear; that his absence at that time could not have failed to be noticed is also evident. But I see no reason to conclude that the same observation can be applied to an absence during the month of April and the early part of May.

It is urged that Knight could not have made this journey by reason of the height of the waters in the streams. But Fremont found no difficulty in marching from Klamath Lake to Sacramento, between the 9th and 24th May, the upper waters, at least, of the Sacramento and San Joaquin being then low; and Major Gillespie, about the same time, made the journey from Monterey to Klamath Lake, and back to San Francisco. That the journey was attended with some difficulty may be admitted, but it cannot be affirmed that to a bold horseman like Knight it was impossible. It is urged that such a journey to an American would have been attended with great difficulty, owing to the hostile feelings of the Californian authorities and population; such, no doubt, was the fact. But Knight was a naturalized Mexican, married to a Mexican woman, and had resided

a long while in the country. The bando of Castro only embraced settlers who had not become Mexican citizens, and who had not been a year in the country; and Fremont states that though Knight was a prominent actor in the rising, he was not "ostensibly so," and that he employed him as a spy— "an occupation which led him to the neighborhood of the bay, where he could communicate with the Mexicans and ascertain their movements." Knight must, therefore, have preserved his friendly relations with the Mexicans; and if his real sentiments were so little known that Fremont could, in May, and subsequently during the whole campaign, employ him as a spy, it is to be presumed that, in the preceding April, he could have had little to fear from the hostility of the Californians. It is urged that Fremont states that he does not know whether Knight was in Los Angeles in May, 1846, and that he would certainly have known it had he been there. But it would seem that this statement of Colonel Fremont furnishes as strong an argument for the claimants as against them. If Knight was in Fremont's employ, or with him, during the whole month of May, as contended for on the part of the United States, Colonel Fremont would have been able to state positively that he was not in Los Angeles during that month. His inability to state anything on the subject shows that Knight could not have been with him; nor was he acquainted with his movements during the period alluded to. It may also be observed that Colonel Fremont mentions that Knight brought him his papers just before his death; that he described them; but the witness does not recollect his description; that he does not recollect his saying anything of Micheltorena in connection with them; he thinks he spoke rather of Pico; and that he does not recollect that he stated that his papers were imperfect.

On the whole, after a careful consideration of the evidence on the point we have been considering, my opinion is that the United States have not established satisfactorily the fact that Knight was not in Los Angeles at the time mentioned by the claimants' witnesses. Many circumstances render it improbable; but it is positively sworn that he was there, and the statement may very possibly be true. I have been unable to bring my mind to the conclusion that the claim ought to be rejected as spurious, on the ground that he was not, and could not have obtained it at the time stated by the witnesses. The only testimony to show that the grant was in fact issued, to which we have thus far adverted, is that of Moreno and that of N. A. Den. If the case of the claimants rested on this testimony alone, I should not hesitate to reject it, for I should consider it too unreliable or too loose to justify me, under all the circumstances, in considering the issuance of the title as proved, but the claimants have produced from the archives an ex-

pediente, which if genuine establishes beyond doubt the facts of Knight's application for the land and of the grant made by Governor Pico. The expediente consists of a petition by Knight, a marginal order by Pico, a decree of concession signed by the same officer and the usual borrador or copy of the title delivered to the party. The signature of Pio Pico and Moreno as they appear on these papers are proved to be genuine, nor is any question made on that point. The signatures on the borrador or copy are not those of Pico or Moreno, as that instrument was a copy of the grant issued to the party, which was attached to other papers in the expediente on which the governor's signature was usually written or else copied by the clerk who prepared the borrador, but the marginal order, and the decree of concession directing the title to issue, bear the genuine signatures of the governor.

It is said that the existence of these papers in the archives proves nothing, for they may have been fabricated and placed there subsequently to their dates. The archives of the former government after Monterey was taken possession of by the United States, were transferred, as is well known, to Sutter's Fort, where they remained until the Spring of 1847. They were then returned to Monterey, and remained in charge of Governor Mason, and the officers under him, until February, 1850. Both Fremont and Major Halleck swear that while they remained in their charge they were carefully guarded, and Major Halleck testifies that while they were in his charge no paper was placed among the archives without placing a memorandum upon it giving the date at which and the person by whom it was deposited. That an expediente may, notwithstanding, have been foisted into the archives is possible, but not probable; but the indexes which were, during the year 1847, prepared by Hartnell and Halleck, show at that date at least this expediente was archived. Captain Halleck, who was secretary of state under Governor Mason, states that he was assisted in the duties of that office by W. P. E. Hartnell, and that early in the year 1847, Mr. Hartnell commenced arranging and numbering the expedientes in the office—that he before the month of June, 1847, had prepared an index of the expedientes on file. That subsequently in 1848, Mr. Hartnell and himself prepared a second index which was similar to the first except that a few expedientes were noted on it which had been overlooked by Mr. Hartnell when the first was prepared. A note of these was also inserted by Mr. Hartnell on his first index. Both of these indexes are now found in the surveyor general's office—they are identified by Major Halleck. On both, this expediente is noted not among the omitted expedientes but among those originally indexed. The expedientes found in the archives appear to have been numbered by the Mexican authorities from one to five

hundred and twelve inclusive. This numeration was therefore continued by Mr. Hartnell and the remaining expedientes were numbered by him up to five hundred and seventy-nine. The number of the expediente was written on its back, and was also noted in the index made by him. On the back of the expediente produced in this case the name of the land "Carmel" with the number 550 appear, and the grant is mentioned by the same name and number in the index. The handwriting [of the] index, is proved to be Hartnell's. That the numbers were inscribed upon the expedientes before the index was made, appears probable, but it is certain that when the index was made this expediente must have been in the archives—and this for two reasons: first, that the note of it seems to be written with the same ink, and apparently at the same time with the rest of the index; and secondly, because it is numbered as its date requires. It is dated, as has been said, May 4th, 1846. It is numbered 550; No. 549 is dated May 2d, 1846; No. 551 is dated May 6th, 1846. It must, therefore, with the other expedientes, have been in the office when the index was prepared, and its number affixed to it. It could not have been subsequently deposited and a note of it inserted in the index, for in that case it would either have had no number, or there would have been two expedientes, both numbered 550. Unless, therefore, the testimony of Major Halleck be entirely rejected, and it has not been contradicted, we must believe that in 1847, when the index was made, there was in the archives an expediente for the grant of a place called "Carmel" to William Knight. It has been suggested that that expediente may not have been the one now produced. That the expediente on the outer sheet of which Mr. Hartnell placed the number 550, and which he noted in his index, may have been the expediente of the Micheltorena papers heretofore alluded to. But this conjecture or suspicion seems unsupported by facts.

First. It seems from all the evidence that the Micheltorena papers remained in Knight's possession from the time they were returned to him after his unsuccessful application to the governor. The tesimony of Leese is relied on by the United States to show that in October, 1847, he added his certificate and appended certain words to his report. They are now produced from the custody of Knight's administrator. No evidence whatsoever has been adduced to show that they were ever in the archives. And—

Second. On the back of the expediente and in the indexes the name of the land granted ("Carmel") appears. This name is in the handwriting of Mr. Hartnell. It appears to have been written at the time when the No. 550 was inscribed upon the document. Mr. Hartnell could only have known the name of the place from inspection of the papers; and the Micheltorena papers contain no designation of the place by name. The name "Car-

mel" for the first time appears in Pio Pico's decree of concession.

Third. Had the Micheltorena papers been contained within the cover of the expediente, the number 550 could not have been affixed to it. The latest of these documents is dated 1844. The expedientes were numbered by Mr. Hartnell in the order of their dates. It is impossible that he should have affixed to documents dated in 1844 the number 550, while he numbered a document dated May 2d, 1846, 549, and another dated May 6th, 1846, 551.

I think it clear, therefore, that at the date of making the index of Hartnell this expediente was on file in the archives. It is admitted that Pio Pico left California in August 1846, and did not return until July, 1848. As his signatures, as they appear on the documents contained in the expediente, are shown to be genuine, it follows that he must have made the grant either at its date, or subsequently, before his flight, or during his absence in Mexico.

It has been argued with great earnestness that it is in the highest degree improbable that Pico, with his known hostility to Americans, would have made this grant in May; but it is still more improbable that he would have made it in June, July or August, after the insurrection had broken out, or after Monterey had been captured. During all these months Knight was with Fremont, and he marched south with him at the close of June. It seems equally improbable that Pico could have made the grant during his absence in Mexico. Certainly he would not have done so unless some pecuniary or other inducement had been held out to him. The course of events surely had not tended to diminish any hostility to Americans he might previously have entertained. It does not appear that Knight had any pecuniary resource, nor did the nature of his employment leave him much time to enter upon and consummate such a negotiation with an ex-governor of California, residing in Mexico. Major Gillespie testifies that he remained on duty in the Sacramento valley until late in the fall of 1846. He then went south as a guide to Colonel Fremont, and arrived in Los Angeles about January, 1847, for the first time after the commencement of hostilities. He remained in Los Angeles about a month, and then went north as a bearer of dispatches. But the expediente, as we have seen, must have been in the archives at least as early as the middle of 1847. It seems, therefore, scarcely possible that Knight could, during this time, have procured the grant from Pio Pico, in Mexico, and subsequently have succeeded in placing the expediente in the archives before the index was made, and without the knowledge of either Hartnell or Halleck.

The counsel for the United States have dwelt with much force on the fact that Knight, so late as October, 1847, was procur-

ing certificates from Leese and Hardy, and apparently relying solely on the Micheltorena papers. It is to be considered, however, that at that time, if Brannan is to be believed, Knight had lost the grant alleged to have been issued to him by Governor Pico. The archives which had been carried to Sutter's Fort, and there remained until the spring of 1847, had only a few months before been taken to Monterey. They were then, and for a long time afterwards, in much confusion. It is, therefore, possible that Knight may have regarded the loss of his grant from Pico as fatal to his claim, and turned his attention to the Micheltorena papers, with a view of making out some "shadow of title," which he had been advised would be sufficient. The fact that he was engaged on the Micheltorena papers in October, 1847, would seem to indicate that up to that time he was not aware that the expediente since produced was among the archives. If it had been fraudulently placed there already, the fraud must have been accomplished without Knight's knowledge, which is impossible. That it was among the archives at the end of 1847 we have seen has been proved.

After a most careful consideration I have been unable to resist the conclusion that the existence of this expediente in the archives in 1847 must be taken as proved, and that the hypothesis that it was placed there after its date and during the absence of Pico from California is not only unsustained by proofs but is extremely improbable. If this conclusion be correct, it follows that the execution and issuance of the title to Knight must be considered as established by proofs from the archives, in their nature far more satisfactory than would have been the production by the claimant of the title unsupported by such proofs—for the genuineness of a document of this kind produced by the claimant and unconfirmed by the public records is always open to suspicion. The evidence thus furnished by the archives is not in my opinion rebutted by the testimony already examined as to the whereabouts of Knight in May, 1846, the difficulty of making the journey to Los Angeles or the improbability that Pico would have made the grant, for the testimony on these points is inconclusive and unsatisfactory; while the evidence from the archives, if Maj. Halleck's statement with respect to the indexes be correct, is positive and reliable.

It is objected that the grant, even if made by the governor, is void, because the expediente does not contain any order of reference or "informe" by officers, which by the regulations the governor was required to obtain. In support of this position the case of U. S. v. Cambuston, 20 How. [61 U. S.] 62, is relied on. In that case no expediente whatever was produced, neither a petition, a map, a marginal order, reference for information, informe or decree of concession appeared to have been made; nor was any evidence offered to show that any one of the preliminary steps made requisite by the act of 1824, and the regulations of 1828 to a grant by a Mexican governor, had been observed. The recital in the grant itself, the supreme court declare "not to be conclusive or even satisfactory evidence of the facts when the question is raised whether or not the alleged grant was made in conformity with the requirements of law—in other words, whether the preliminary conditions had been complied with which enabled the governor in the particular case to make the grant, especially in respect to those preliminary proceedings which are required to be of record, and of which record evidence should have been produced or its non-production satisfactorily accounted for."

But the case at bar is essentially different. The record evidence is produced showing that a petition was presented—that a decree of concession was made—and that the title, a copy of which is contained in the expediente, issued. The decree of concession alludes to a report of the alcalde of Sonoma, which is not found in the expediente, and the petition states that a report of that officer is annexed to the petition. What has become of that report does not appear, but I cannot consider that the absence of that single document even unaccounted for, is sufficient to defeat the grant. The evidence that the governor complied with the preliminary conditions which enabled him to make the grant does not consist, as in the case of Cambuston, merely of a general recital that the customary investigations had been made, which recital is contained in a document produced from the claimant's custody, but it clearly appears that a petition was presented by the applicant, which purports to be accompanied by a report. This report is specifically alluded to by the governor in making his preliminary decree according to the petition, and all this is of record. It is also to be remarked that the regulations of 1828, while they require that a petition expressing the name, country, religion, etc., of the applicant, shall be addressed to the governor, merely direct the governor to obtain the necessary "information as to the land and the petitioner, in order that the application may be attended to—or if it be preferred the municipal authority may be consulted whether there is any objection to making the grant." It is clear that this regulation left it discretionary with the governor whether to consult the municipal authority or not. Nor does the direction to him to obtain the necessary information in terms oblige him to resort to any particular mode of ascertaining the facts. It would seem, therefore, that where the governor is from personal knowledge or oral information satisfied that the land is vacant and that the petitioner has the necessary qualifications and thereupon without requiring informes in writing accedes to the petition, the grant ought not to be avoided because no informes are found in the expediente, and such seems

to have been the view of the supreme court in the subsequent case of U. S. v. Sutter [21 How. (62 U. S.) 171], the claim in which was confirmed notwithstanding that no informes were contained in the expediente.

After the best consideration I have been able to give this case, my opinion is that although there are some suspicious or rather improbable circumstances connected with the claim, yet on the whole the preponderance of proof is in favor of its genuineness, and that it ought to be confirmed. A decree of confirmation must therefore be entered.